ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL III

| LEON SITES CORPORATION<br><br>Apelante<br><br>V.<br><br>WSTE, LLC<br><br>Apelada | TA2025AP00426 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Caso Núm.: PO2025CV02134<br><br>Sobre: Desahucio en Precario |
|---|---|---|

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Rivera Torres y el Juez Marrero Guerrero.

Marrero Guerrero, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 11 de diciembre de 2025.

Comparece Leon Sites Corporation (Leon Sites o apelante) y nos solicita revisar una *Sentencia* emitida el 29 de septiembre de 2025 por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI).[1] En dicho dictamen, el foro primario declaró No Ha Lugar la *Demanda* de desahucio en precario promovida por Leon Sites contra WSTE, LLC (WSTE o apelado).

Por los fundamentos que expondremos a continuación, confirmamos el dictamen apelado.

### I.

Este caso se originó el 4 de agosto de 2025, cuando Leon Sites presentó una *Demanda* contra WSTE, Univisión de Puerto Rico, Inc. (Univisión), Univisión Puerto Rico Station Production Company, Univisión of Puerto Rico Real Estate Company LLC y Spire Tower PR LLC (Spire).[2] Entre sus alegaciones, se señaló que el 19 de noviembre de 2003, el señor Luis Guillermo León y la señora María Luisa Rodríguez (matrimonio León Rodríguez) otorgaron una escritura

---

[1] Entrada Núm. 42 del caso PO2025CV02134 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC). Notificada el 2 de octubre de 2025.
[2] *Íd.*, Entrada Núm. 1. Leon Sites desistió voluntariamente del pleito contra Univisión, Univisión of Puerto Rico Real Estate Company LLC, Univisión Puerto Rico Station Production Company y Spire. Véase Entradas Núm. 11, 20 y 23 en SUMAC.

mediante la cual arrendaron una propiedad ubicada en el municipio de Ponce a favor de WLII/WSUR Inc., posteriormente Univisión.

El apelante alegó que el 20 de julio de 2006, el matrimonio León Rodríguez permutaron la propiedad arrendada a Leon Sites a cambio de acciones corporativas. Arguyó que, mediante carta del 23 de abril de 2024, WSTE notificó que Univisión le cedió el arrendamiento y que, como parte del proceso de reorganización, lo cedería a Spire. No obstante, planteó que, según el Registro de la Propiedad, Spire volvió a ceder el arrendamiento a WSTE mediante escritura del 27 de agosto de 2024, sin previa notificación, en contravención con la cláusula décima de la escritura de arrendamiento.

Por otro lado, señaló que la cláusula tercera disponía que el arrendamiento tendría una vigencia de cinco (5) años a partir del 1 de diciembre de 2003, y que en la cláusula quinta se fijó un canon anual de $40,380.00, pagadero en plazos mensuales de $3,365.00, a partir del 1 de marzo de 2004, estableciéndose que los pagos efectuados luego de los primeros diez (10) días del mes serían considerados en mora o tardíos.

El apelante afirmó que la cláusula sexta le otorgaba a la parte arrendataria la opción de extender el arrendamiento por cinco (5) términos adicionales de cinco (5) años cada uno, a menos que notificara lo contrario con noventa (90) días de antelación, y que el canon sería actualizado según el Índice de Precios al Consumidor publicado por el Departamento del Trabajo de Puerto Rico. Indicó que, desde marzo de 2025, había exigido por escrito el pago de los incrementos que debieron comenzar a cubrirse en diciembre de 2008, por lo que se acumularon alrededor de doscientos un (201) meses sin ajuste. Destacó que la controversia se centraba exclusivamente en el monto adeudado por concepto de los incrementos en la renta.

A su vez, adujo que las cláusulas séptima y vigesimosexta le conferían el derecho a terminar el contrato por violación a los

términos y las condiciones pactadas. Sostuvo que, en la misma fecha de la radicación de la *Demanda,* avisó por correo electrónico la resolución inmediata del contrato debido a la falta de notificación previa sobre la cesión de Spire a WSTE y por el incumplimiento en el pago de los incrementos desde diciembre de 2008.

Leon Sites enfatizó que esta *Demanda* se basó exclusivamente en la causal de desahucio en precario, puesto que el contrato ya había sido resuelto de forma inmediata y en un pleito separado se iba a atender el cobro de las sumas adeudadas. Alegó que, aún si la parte demandada consignara la suma adeudada, ello no tornaría académica la *Demanda*, ya que era ineficaz al no haberse realizado dentro de los primeros diez (10) días del mes.

Tras varios trámites procesales, los días 27 de agosto y 5 de septiembre de 2025, el tribunal de instancia celebró la vista en su fondo sobre desahucio en precario, en la que testificaron los señores Luis Guillermo León Rodríguez y Javier Maynulet.[3]

Una vez sometido el asunto, el 29 de septiembre de 2025, el TPI emitió una *Sentencia* en la que declaró No Ha Lugar la *Demanda* de desahucio en precario y formuló las siguientes determinaciones de hechos, tras aquilatar la prueba documental y testifical:[4]

1. La parte demandante[,] Leon Sites Corporation[,] es una corporación debidamente organizada y existente bajo las leyes del Estado Libre Asociado de Puerto Rico.
2. La parte demandada[,] WSTE, LLC[,] es una compañía de responsabilidad limitada foránea organizada bajo las leyes del estado de Delaware, Estados Unidos, autorizada a hacer negocios en Puerto Rico.
3. El 19 de noviembre de 2003, el Sr. Luis Guillermo León, la Sra. María Luisa Rodríguez y WLII/WSUR, Inc., otorgaron ante el notario Luis A. Ortiz Alvarado la Escritura Número Seis (6) sobre Arrendamiento. Mediante dicha escritura se cedió en arrendamiento la finca [...]
4. La propiedad arrendada consta inscrita como la Finca 817, en Karibe, Ponce Sur, Registro de la Propiedad de Puerto Rico, Sección II.
5. En la Cláusula Tercera de la Escritura de Arrendamiento se pactó que el arrendamiento tendría una duración de cinco (5) años, comenzando el 1 de diciembre de 2003 y expirando el 1 de noviembre de 2008. Dicha cláusula dispone expresamente:
    "THIRD: That in consideration of the terms, covenants and agreements herein contained LESSOR leases to LESSEE and LESSEE leases from LESSOR a portion of

---

[3] *Íd.*, Entrada Núm. 33; Entrada Núm. 39 y Entrada Núm. 41.
[4] Entrada Núm. 42. Notificada el 2 de octubre de 2025.

the property described in the paragraph FIRST of the deed, for a period of five (5) years commencing on the first day of the month of December of the year two thousand and three (2003) and expiring on the first day of the month of November of the year two thousand and eight (2008)".

6. La Cláusula Quinta de la Escritura de Arrendamiento dispone sobre la renta, que la arrendataria pagará un canon anual de $40,380.00, en plazos mensuales de $3,365.00, con un [período] de gracia hasta el 29 de febrero de 2004, por lo que la obligación de pago comenzaba el 1 de marzo de 2004. Además, se pactó que los pagos recibidos después del décimo día del mes serán considerados como un pago tardío. En dicha cláusula se dispuso expresamente:

"FIFTH: RENT: LESSEE agrees to pay and will pay LESSOR an annual rent of forty thousand three hundred and eighty dollars ($40,380.00) payable in equal monthly installments of three thousand three hundred sixty-five dollars ($3,365.00) at the offices of the LESSOR. Nevertheless, the LESSEE, (sic) will have a grace period until the twenty-ninth (29th) of the month of February of the year two thousand and four (2004) during which time it will not be obligated to pay LESSOR the before mentioned rent. After this grace period, the LESSEE, (sic) shall pay the rent in advance monthly installments, starting the first day of the month of March of the year two thousand and four (2004) and continuing payments the first day of each next month. A payment received after the tenth (10th) day of the month, (sic) will be considered a late payment."

7. La Cláusula Sexta de la Escritura de Arrendamiento dispone sobre la extensión al contrato, que la parte arrendataria tendría la opción de extender el arrendamiento por cinco (5) términos adicionales de cinco (5) años cada uno, salvo; que por lo menos noventa (90) días antes de la fecha de vencimiento del término corriente, dicha parte notifique al arrendador por escrito su intención de no extender el contrato. Todas las extensiones serán bajo los mismos términos y condiciones de la Escritura de Arrendamiento, excepto que el canon de arrendamiento para todas las extensiones será actualizado utilizando el porcentaje de aumento en el Índice de Precios del Consumidor, según publicado por el Departamento del Trabajo de Puerto Rico. Se advierte que si en el aniversario del contrato cada cinco (5) años, el Departamento del Trabajo de Puerto Rico no tiene publicado un Índice de Precios del Consumidor, las partes acuerdan utilizar el último Índice de Precios del Consumidor publicado por el Departamento del Trabajo. En esos términos dispone expresamente:

SIXTH: EXTENSION: LESSEE shall have the option to extend this lease for five (5) additional terms of five (5) years each, unless ninety (90) days before the expiration of the current term gives the LESSOR a written notice of its election to not make such extension. All extensions shall be upon the same terms and conditions of this lease, except that the rent payments for all extensions will be updated using the percentage increase in the consumer price index as published by the Labor Department of Puerto Rico. If in the anniversary of the contract (each five years), the Labor Department of Puerto Rico, does not have the current price index, the parties agree to use the last one known by the Labor Department of Puerto Rico. If this Department disappears or changes his name, the information will be obtained from the governmental organism with faculty to provide that kind of information. In that manner, the LESSEE shall pay in addition to the yearly rate (*sic*) paid during the immediately preceding year, an increase in the monthly rent based upon the percentage increase in the consumer price index as published by the Labor Department of Puerto Rico. The annually rent shall be

divided and paid in equal monthly installments, the reason of this clause is to keep updated the rent."

8. La Cláusula Séptima de la Escritura de Arrendamiento dispone que el arrendador garantiza al arrendatario el uso de la propiedad arrendada durante la duración total de acuerdo de arrendamiento, el cual será por treinta (30) años, consecuentemente renunciando el arrendador a su derecho de finalizar el presente acuerdo, excepto por falta de pago o violación a este contrato. En dicha cláusula [se] dispuso expresamente:

> "SEVENTH: LESSOR guarantees LESSEE the use of the property described in paragraph FIRST and FOURTH during the total life of the Lease Agreement, which will be of thirty (30) years, consequently waiving the LESSOR it's (sic) right to terminate the present agreement except for lack of payment or infringements of this contract."

9. La Cláusula Vigésima Primera de la Escritura de Arrendamiento dispone que toda notificación o reclamación del arrendador al arrendatario o del arrendatario al arrendador se considerará debidamente entregada si se envía por correo registrado o certificado dirigido al arrendador a la dirección postal: Urb. Morell Campos, Figaro Street Number 2, Ponce, Puerto Rico, 00731, y a la parte arrendataria a la dirección: Box A, Old San Juan Station, San Juan, Puerto Rico, 00901. Además, las partes acordaron expresamente que las notificaciones podrán hacerse a cualquier otra dirección que el arrendatario haya designado mediante notificación por escrito al arrendador, y viceversa. A esos fines la citada cláusula dispone expresamente:

> "TWENTY-FIRST: Any notice or demand from LESSOR to LESSE or from LESEE to LESSOR shall be deemed duly served if mailed by registered or certified mail addressed if to LESSOR at Urb. Morell Campos, Figaro Street number two (2), Ponce, Puerto Rico, zero, zero seven thirty-one (00731), and if to LESEE, at Box A, Old San Juan Station, San Juan, Puerto Rico, zero, zero, nine, zero, two or such other address as LESSEE shall have last designated by notice in writing to LESSOR in the same form and vice-versa."

10. La Cláusula Vigésima Sexta de la Escritura de Arrendamiento dispone sobre el incumplimiento, que todas las cláusulas que contiene esta escritura son esenciales. La violación a cualquier cláusula deberá ser discutida entre las partes dentro de los treinta (30) días de dicha violación. Después de ello, la parte que haya incurrido en la infracción tendrá sesenta (60) días contados a partir de la discusión para subsanar cualquier disposición de incumplimiento, excluyendo el incumplimiento con respecto al pago, el cual deberá subsanarse en los próximos diez (10) días de su vencimiento. Luego del décimo día del mes, el pago será considerado un pago tardío. Además, acordaron que cuatro (4) pagos tardíos en el mismo año, se considerará una violación del contrato, suficiente para finalizar el mismo. De forma expresa dicha cláusula dispuso:

> "TWENTY-SIXTH: DEFAULT: All clauses contained herein are deemed essential. Any violation to any clause shall be discussed between the parties within thirty (30) days of such violation. Afterward, the party that incurred in the violation will have sixty (60) days, starting from the discussion to cure any default provision, excluding default regarding payment that shall be cured in the next ten (10) days from his past due. After the tenth (10th) day of the month, the payment will be considered a late payment. Four (4) late payments in the same year, (sic) will be considered a violation of the contract, sufficient to terminate the contract."

11. Mediante la Escritura Número 20, otorgada el 20 de julio de 2006, ante el notario Ramón A. Hernández Rivera, los arrendadores Luis Guillermo León y María Luisa Rodríguez le permutaron a la parte demandante Leon Sites Corporation la propiedad arrendada por acciones de dicha corporación.

12. El 29 de diciembre de 2021, [WLII] notificó al Registro de la Propiedad sobre el cambio de nombre a Univision of Puerto Rico, Inc. ("Univision").

13. El 1 de septiembre de 2023, Univision y WSTE otorgaron ante el notario Luis Morales Steinmann la Escritura Número 4, titulada "Assignment and Assumption of Lease Agreement" en la que Univision le cedió el contrato de arrendamiento a WSTE, la cual fue inscrita en el Registro de la Propiedad.

14. El Lcdo. León ocupa el cargo de Vicepresidente de Leon Sites y fue autorizado, mediante [...] Resolución Corporativa para la comparecencia en el presente caso.

15. El Lcdo. León declaró que los otorgantes originales de la Escritura de Arrendamiento son sus padres, el Sr. Luis Guillermo León, quien falleció[,] y la Sra. María Luisa Rodríguez. El Lcdo. León estuvo envuelto en todas las negociaciones y acompañó a sus padres, en calidad de abogado al momento de firmar la Escritura de Arrendamiento. El Lcdo. León afirmó que su participación fue leer la escritura, explicar los términos a sus padres, revisión que el borrador fue igual a la Escritura firmada, pero no participó en la redacción de la Escritura de Arrendamiento.

16. El Lcdo. León declaró que como abogado entendió que la Cláusula Sexta de la Escritura de Arrendamiento, tiene el propósito de que los pagos por rentas por todas las extensiones sean actualizados a base del Índice de Precios del Consumidor publicado por el Departamento del Trabajo y Recursos Humanos. La renta será actualizada cada cinco (5) años por un [período] de treinta (30) años. Según el contrato, al sexto año sería el aumento de la renta.

17. El Lcdo. León declaró que los arrendatarios no han pagado ninguna cantidad por concepto de incremento en renta.

18. El Lcdo. León declaró que desde el 1 de diciembre de 2008 al presente hizo gestiones telefónicas para el pago del incremento de la renta. El 6 de junio de 2023 visitó personalmente las Oficinas de Univision, pero lo dejaron esperando.

19. El Sr. Peter Lynch, Vice Presidente de Bienes Raíces y Facilidades de TelevisaUnivision envió una comunicación a la Sra. María Rodríguez Colón con el propósito de iniciar conversaciones para extender el contrato de arrendamiento. Dicha comunicación fue enviada a la siguiente dirección postal: Urb. Morell Campos, Calle Figaro #2, Ponce, PR 00731. En dicha comunicación expresó el interés de extender el contrato de arrendamiento para el terreno donde se encuentra la torre de telecomunicaciones, ello antes del vencimiento del término final del acuerdo original.

20. El Lcdo. León declaró que el Lcdo. Joaquín Nigaglioni fue la persona que representó legalmente a la parte demandante e hizo gestiones de cobro para que la parte demandada pagara el arrendamiento completo.

21. El Lcdo. León declaró que la primera vez que la parte demandante notificó por escrito a la parte [demandada] sobre el incumplimiento en el pago por ajuste o incremento en renta establecido en la Cláusula Sexta de la Escritura de Arrendamiento fue a través de una carta con fecha de 12 de marzo de 2025 dirigida por el Lcdo. Nigaglioni a la atención del Sr. Peter Lynch, Vice-Presidente del Departamento de Bienes Raíces y Facilidades de TelevisaUnivision.

22. En la comunicación enviada el 12 de marzo de 2025 por el Lcdo. Joaquín V. Nigaglioni al Sr. Peter Lynch indicó que la Cláusula Sexta de la Escritura de Arrendamiento, se refiere al Índice de Precios del Consumidor publicado por el Departamento del Trabajo y Recursos Humanos de Puerto Rico, y que a pesar de su lenguaje sencillo, la falta de claridad sobre cuál Índice de Precios al Consumidor aplicaría el "CPI-U o el CPI-W". En la comunicación informó que para atender la ambigüedad ha seleccionado el CPI-U (Índice de Precios del Consumidor de Puerto Rico Mid-Atlantic) y lo utilizó para calcular el porcentaje acumulado del aumento desde junio de 2003 a febrero de 2025 para un total de 266 meses[,] 22 años y 2 meses. Con la comunicación se anejó un documento que indica cómo usar el Índice de Precios del Consumidor para una cláusula de ajuste en un contrato, y una tabla, con el cómputo y la fórmula utilizada.

23. En la comunicación enviada el 12 de marzo de 2025 por el Lcdo. Joaquín V. Nigaglioni al Sr. Peter Lynch, se informó que la Sra. Rodríguez no tiene objeción en extender el contrato de arrendamiento y a renovar el acuerdo contractual, pero solicitó que en el término de treinta (30) días antes de negociar los términos y condiciones de cualquier renovación del contrato de arrendamiento la parte demandada deberá realizar el pago de la suma de $278,435.00, siendo la deuda acumulada.

24. El Lcdo. León declaró que[,] a partir de que se remitió la carta del 12 de marzo de 2025, a la parte demandada, en la que se les comunicó que no estaban pagando, comenzaron las negociaciones entre las partes.

25. El 11 de abril de 2025, el Sr. Javier [Maynulet], EVP & CFO-US Networks, Local Media & Production Ops, TelevisaUnivision, envió una comunicación al Lcdo. Joaquín Nigaglioni. En la comunicación indicó que es en respuesta a la reciente comunicación enviada, la cual fue traída a su consideración luego del retiro del Sr. Peter Lynch. El Lcdo. León indicó que en dicha comunicación se hace referencia a que hubo un descuido con relación al pago del incremento de la renta.

26. El Lcdo. León declaró que como arrendador dio por terminada las negociaciones con la parte demandada el 4 de agosto de 2025, las cuales habían comenzado para marzo de 2025, debido a que no habían pagado parte de la renta. La parte demandante no podía seguir perdiendo dinero, esperando por la parte demandada. La parte demandada se había mantenido pagando la misma suma de $3,365.00 mensuales que se acordó en el 2003 y todavía en el 2025 se negaban a pagar el incremento. esa fue la razón por la que se dio por terminado el contrato de arrendamiento.

27. El Lcdo. León admitió que en la Cláusula Sexta de la Escritura de Arrendamiento cuando se hace referencia al cómputo del incremento en renta, no se indica que fuera acumulativo.

28. El Lcdo. León reconoció que el [período] de aniversario del contrato es cada cinco (5) años. El Sr. León admitió que, al leer la Cláusula Sexta de la Escritura de Arrendamiento, estaba claro lo relacionado al aumento de la renta, por lo que recomendó a sus padres firmar la Escritura de Arrendamiento.

29. El Lcdo. León[,] al leer la última oración del segundo párrafo de la carta del 12 de marzo de 2025, admitió que, en dicha carta, el Lcdo. Nigaglioni señaló que la Cláusula Sexta de la Escritura de Arrendamiento no está clara.

30. El Lcdo. León admitió que no se envió la carta del 12 de marzo de 2025 a la parte demandada por correo certificado con acuse de recibo.

31. El Lcdo. León reconoció que la Escritura de Arrendamiento consta inscrita en el Registro de la Propiedad.

32. El Lcdo. León[,] al revisar la [Cláusula] Séptima de la Escritura de Arrendamiento, reconoció que el arrendador se comprometió a garantizar el uso de la propiedad, por parte del arrendatario por un [período] de treinta (30) años. Además, el arrendador puede terminar el contrato por falta de pago o incumplimiento del contrato. A su vez, admitió que, si no hay incumplimiento y no hay falta de pago, el demandado tiene derecho [a] permanecer en la ocupación del predio por treinta (30) años.

33. El Lcdo. León reconoció que el contrato se otorgó en el 2003, por lo que la primera extensión fue en el 2008, siendo la primera vez donde entró en operación la actualización de la renta que contempla la Cláusula Sexta de la Escritura de Arrendamiento. El Lcdo. León admitió que en ese momento la parte demandante no reclamó el incremento en el pago de renta, por escrito, conforme se estableció en la Escritura de Arrendamiento.

34. El Lcdo. León admitió que, acorde a la Cláusula Vigesimosexta de la Escritura de Arrendamiento, cualquier violación deberá ser discutida entre las partes dentro de los treinta (30) días de dicha violación. El Lcdo. León declaró que en el 2008 hubo una discusión por falta de pago del incremento de renta, de forma verbal y "cuando único fue por escrito fue en la carta del 12 de marzo de 2025 y esperamos 131 días".

35. El Lcdo. León declaró que[,] en relación con la Cláusula Vigesimoprimera de la Escritura de Arrendamiento, fue discutida de forma verbal en el 2008, no se puso por escrito, ni se envió por correo certificado con acuse de recibo a la dirección

que indica la propia Cláusula Vigesimoprimera de la Escritura de Arrendamiento. El Lcdo. León reconoció que se hizo por escrito el 12 de marzo de 2025, después de cuatro (4) pagos incumplidos. La parte demandante no realizó una notificación por escrito a la parte arrendataria en el 2013, ni en el 2018 ni en el 2023.

36. El Sr. León reafirmó que la carta del 12 de marzo de 2025 fue la primera notificación por escrito, pero no se envió a la dirección postal que aparece en la Cláusula Vigesimoprimera de la Escritura de Arrendamiento. El Lcdo. León señaló que esa era la dirección de WLII y no la de Televisa, sus abogados verificaron la dirección y la enviaron. El Lcdo. León admitió que la parte demandante no recibió una notificación por parte del arrendatario informando un cambio en la dirección postal de conformidad con la Cláusula Vigesimoprimera de la Escritura de Arrendamiento, según dispone dicha cláusula.

37. El Lcdo. León reconoció que la carta del 9 de mayo de 2025, suscrita por el Lcdo. Joaquín Nigaglioni, a nombre de Leon Sites Corp., tampoco se envió a la dirección postal ni se envió por correo certificado con acuse de recibo, como requiere la Cláusula Vigesimoprimera de la Escritura de Arrendamiento.

38. El Lcdo. León reconoció que las cartas del 17 de mayo de 2025, del 25 de junio de 2025 y del 4 de agosto de 2025, se enviaron por correo electrónico; y tampoco se notificaron por correo certificado ni a la dirección postal indicada en la Cláusula Vigesimoprimera de la Escritura de Arrendamiento.

39. El Lcdo. León reconoció que, en las cartas del 12 de marzo de 2025, del 9 de mayo de 2025, del 17 de mayo de 2025 y del 25 de junio de 2025, cursadas a la parte demandada durante el [período] de tres (3) meses, se informó a la parte demandada por concepto de incremento de renta, cantidades diferentes en cada comunicación.

40. El Lcdo. León declaró que en la carta enviada el 25 de junio de 2025 por el Lcdo. Joaquín Nigaglioni al Sr. Javier [Maynulet], este reconoció que la cláusula de escalación adolece de claridad. Por ello, se contrató un economista cualificado para determinar la metodología correcta para aplicar el Índice de Precios del Consumidor según el contrato de arrendamiento. En dicha comunicación se informó que basada en dicha metodología se determinó que la deuda al mes de junio de 2025 era la suma de $374,602.40, de los cuales la suma de $252,754.69 correspondía al incremento de la renta según el ajuste y la suma de $121,847.71 por concepto de intereses legales por pago tardío. Además, en dicha carta se informó que la parte demandada ha aplicado una metodología incorrecta para el incremento de la renta. El Lcdo. León declaró que la parte demandante entiende que para cada subsecuente renovación a los cinco (5) años corresponde aplicar el Índice de Precios del Consumidor de los cinco (5) años que preceden, el ajuste es cada cinco (5) años.

41. El Lcdo. León declaró que la carta enviada el 25 de junio de 2025 está dirigida al Sr. Javier Maynulet, y se envió al correo electrónico: jmaynulet@televisaunivision.com.

42. El Lcdo. León identificó que la carta que el Sr. Javier Maynulet remitió el 11 de abril de 2025, como representante de WSTE, fue enviada desde el correo electrónico: jmaynulet@televisaunivision.com. En esa comunicación se identificó como EVP y CFO U.S. Linear de TelevisaUnivision. Es la primera comunicación que envió. Ese es el mismo correo electrónico al que la parte demandante envió la comunicación del 25 de junio de 2025.

43. El Lcdo. León declaró que las cartas y comunicaciones dirigidas por el Lcdo. Nigaglioni y el Lcdo. Vázquez en representación de Leon Sites durante los meses de mayo a agosto 2025 fueron dirigidas al Sr Javier Maynulet, EVP y CFO de Univisión al correo electrónico jmaynulet@televisaunivision.com.

44. El Lcdo. León reconoció que Leon Sites recibió varias comunicaciones de la parte arrendataria informando sobre cambio de inquilino, pero no recuerda si se informó por escrito algún cambio de dirección postal.

45. El Sr. Javier Maynulet, es el Director de Finanzas y Vicepresidente Ejecutivo encargado del [área] de las cadenas de televisión en EU, y de radio y televisiones locales, trabaja para

TelevisaUnivision, [una] subsidiaria de la misma llamada Univision Local Media que es una subsidiaria de WSTE LLC. El testigo lleva trabajando siete (7) años en la empresa y tres (3) en la posición actual.

46. El Sr. Maynulet declaró que la entidad que ocupa la propiedad arrendada objeto de la controversia es una cadena de TV que poseen en Puerto Rico que se llama WSTE con sus siglas dadas por FCC, pero se conoce también como Teleisla, un canal de televisión de Puerto Rico, que se transmite por el Canal 7, WIPR, el canal de servicio público del gobierno para el área sur de Puerto Rico. El arrendamiento de este predio comenzó en el 2003. En el predio hay instalada principalmente una torre de hierro donde se coloca una antena de transmisión. También hay instalada una antena de teléfono móvil arrendado a T-Mobile.

47. El Sr. Maynulet intervino en la negociación que estaba manejando el Sr. Peter Lynch con la parte demandante, luego del retiro de la empresa del Sr. Lynch. El Sr. Maynulet intervino a finales de marzo o principios de abril para manejar las negociaciones sobre la otorgación de un nuevo contrato de arrendamiento. El Sr. Maynulet compareció en las negociaciones en representación de Univisión, quien a su vez tiene una relación de matriz y subsidiaria con WSTE para discutir lo informado en la carta por el Lcdo. Nigaglioni, refiriéndose a la falta de pagos del incremento en la renta mensual a base de la Cláusula Sexta de la Escritura de Arrendamiento.

48. El Sr. Maynulet declaró que entendía que la carta que remitió el Sr. Peter Lynch a la parte demandante se refiere a un nuevo contrato de arrendamiento para la misma propiedad. El Sr. Maynulet declaró que, al retirarse el Sr. Peter Lynch, quien estaba en comunicación con la parte demandante para la negociación de un nuevo contrato, asumió la responsabilidad de lograr un contrato para luego de que se expire el contrato que está vigente.

49. La dirección incluida en la carta del Sr. Peter Lynch fue: 4505 Falls of Neuse Road Suite 660 Raleigh, NC 27609. El testigo reconoció que dicha dirección no es la misma dirección postal indicada en la Cláusula Vigesimoprimera de la Escritura de Arrendamiento sobre notificación.

50. El Sr. Maynulet declaró que cuando se otorgó la Escritura de Arrendamiento no tuvo ninguna participación, relacionada a la negociación o el otorgamiento de la escritura ya que ello ocurrió antes de que comenzara a trabajar con Televisa.

51. El Sr. Maynulet manifestó que en la carta del Sr. Lynch no se menciona nada sobre eso el pago o no pago bajo la Cláusula Sexta de la Escritura de Arrendamiento.

52. El Sr. Maynulet declaró que en la carta enviada por el Sr. Lynch no se notificó a la Sra. Rodríguez Colón sobre un cambio de dirección postal según provee la Cláusula Vigesimoprimera de la Escritura de Arrendamiento.

53. El Sr. Maynulet declaró que la carta del Sr. Peter Lynch fue enviada a la dirección: Urb. Morell Campos, Calle Figaro Núm. 2, Ponce PR 00731. Es la misma dirección postal indicada para notificar a la parte arrendadora en la Cláusula Vigesimoprimera de la Escritura de Arrendamiento.

54. El Sr. Maynulet admitió que recibió todos los correos electrónicos enviados por la parte demandante en cuanto a la metodología utilizada por la parte demandante para calcular el ajuste de la renta. Dichas cartas se le dirigieron a su correo electrónico y este las contestó.

55. El Sr. Maynulet declaró que el canon de arrendamiento está en la Cláusula Quinta de la Escritura de Arrendamiento, y es la suma de $3,365.00 mensuales, el cual se comenzó a pagar en febrero de 2004. El pago se hacía a los demandantes, por cheque que se enviaba todos los meses. A su vez, identificó que según la Cláusula Quinta de la Escritura de Arrendamiento se considera que el pago de renta es tardío, si se efectúa después del día décimo del comienzo del mes.

56. El Sr. Maynulet declaró que WSTE comenzó con el alquiler del predio desde noviembre de 2003. El Sr. Maynulet declaró que los pagos de la parte demandada por concepto de cánones de arrendamiento están al día, ya que no se ha fallado ni un mes. Los pagos correspondientes a los últimos dos (2) meses se consignaron en el Tribunal, ya le estuvo extraño que al final de

agosto, la parte demandante no había depositado el cheque. Se hizo lo mismo para el mes de septiembre de 2025.

57. La parte demandada envió el 25 de agosto de 2025 una comunicación a la parte demandante mediante correo certificado con acuse de recibo a la dirección: Urb. Morell Campos, Figaro Street Number 2, Ponce, Puerto Rico, 00731, según se requiere en la Cláusula Vigesimoprimera de la Escritura de Arrendamiento. La carta está firmada por el testigo. Esa carta fue enviada con el propósito de informar que el pago de renta para el mes de agosto de 2025 y el monto de la renta que entendía se debía según la Cláusula Sexta de la Escritura de Arrendamiento, por los últimos cinco (5) años, se estaba consignando en el Tribunal. El testigo declaró que la Cláusula Sexta no se contempla sea considerado como un pago tardío.

58. El Sr. Maynulet aseveró que antes de esta controversia, la parte demandante no se había quejado sobre la cantidad que recibe como pago de renta mensual bajo la Cláusula Quinta de la Escritura de Arrendamiento, sobre el canon de arrendamiento.

59. El Sr. Maynulet afirmó que en ningún momento la parte demandante se había negado a recibir algún pago de renta bajo la Cláusula Quinta de la Escritura de Arrendamiento. A pesar de que para los meses de agosto y septiembre se consignaron los pagos en el Tribunal, la parte demandante no ha notificado que se estaban negando a recibir el pago.

60. El Sr. Maynulet manifestó que la primera vez que la parte demandante indicó alguna insatisfacción por la cantidad pagada mensualmente por WSTE fue en la comunicación enviada por el Lcdo. Nigaglioni el 12 de marzo de 2025. No conoce sobre alguna insatisfacción expresada con anterioridad a esa fecha.

61. El Sr. Maynulet declaró que la comunicación del Lcdo. Nigaglioni al Sr. Peter Lynch se envió por correo electrónico, aunque la carta indique que fue por correo certificado.

62. El Sr. Maynulet declaró que en la comunicación del 12 de marzo de 2025 la cantidad informada por la parte demandante como deuda fue la suma de $278,435.00, con un Índice de Precios al Consumidor incorrecto. Este cálculo se hizo desde junio del 2003, en lugar de noviembre de 2003 según la Cláusula Sexta de la Escritura de Arrendamiento. El testigo entiende que en dicha cláusula en ningún momento se utiliza el concepto de acumulativo.

63. El Sr. Maynulet luego de esa carta envió una comunicación el 11 de abril de 2025 informando que el cómputo es erróneo debido al Índice de Precios al Consumidor utilizado y el concepto de acumulativo. El Sr. Maynulet explicó que la carta enviada por correo electrónico el 11 de abril de 2025 era en contestación a la carta del 12 de marzo de 2025 enviada por el Lcdo. Nigaglioni en representación de la parte demandante, la cual fue referida a su atención. Además, declaró que la carta del 12 de marzo de 2025 enviada por el Lcdo. Nigaglioni contestaba una carta dirigida por el Sr. Peter Lynch solicitando un nuevo contrato de arrendamiento, para el 2033, a comenzar el día después de que vence el contrato de arrendamiento vigente. El Sr. Maynulet declaró que entiende que la Cláusula Sexta de la Escritura de Arrendamiento no es clara y por eso invitó a la parte demandante a sentarse a dialogar.

64. El Sr. Maynulet declaró que el 9 de mayo de 2025[,] el Lcdo. Nigaglioni envió una comunicación, donde reconoció que requiere unas interpretaciones técnicas y que se podría llegar a un arreglo aceptable. Según el Sr. Maynulet en esta comunicación se vuelve a utilizar un Índice de Precios del Consumidor incorrecto. En esta comunicación se informó una deuda por la suma de $237,948.00, según la formula acumulativa.

65. El 17 de mayo de 2025 el Lcdo. Vázquez envió una comunicación al Sr. Maynulet, la cual es una respuesta a una conversación que tuvieron el 14 de mayo de 2025. En esa comunicación la deuda reclamada por el incremento de la renta según la Cláusula Sexta fue de $181,922.81, más la suma de $71,540.09 por concepto de intereses por pago tardío, para un total de $253,462.90. Se solicitó a la parte demandada que efectuara el pago total en o antes del 31 de mayo de 2025.

66. El 28 de mayo de 2025 el Sr. Maynulet envió una comunicación al Lcdo. Vázquez y al Lcdo. Nigaglioni mediante correo

electrónico. El Sr. Maynulet declaró que en esta comunicación trató de explicar las áreas en desacuerdo y las diferencias en metodología. En esa comunicación se informó que según los cálculos de la parte demandada la deuda por concepto del incremento de la renta es por la suma de $11,974.00, por los pasados cinco (5) años desde mayo de 2020 a mayo de 2025, ante la defensa de prescripción.

67. El 25 de junio de 2025 el Lcdo. Nigaglioni envió una comunicación al Sr. Maynulet donde rechazó la oferta realizada. Según el testimonio del Sr. Maynulet, en dicha comunicación el Lcdo. Nigaglioni reconoció que la Cláusula Sexta de la Escritura de Arrendamiento no tiene especificidad sobre la metodología. El monto reclamado por el aumento de la renta es la suma de $252,754.69, la suma de $121,847.71, por concepto de intereses por pago tardío, para un total de $374,602.40.

68. El Sr. Maynulet declaró que las partes estaban tratando de llegar a un acuerdo y se le hacía muy difícil, ante lo que entendía era un error en los cómputos. Por ello, hizo un acercamiento el 30 de junio de 2025, mediante una comunicación por correo electrónico, indicando que estaba preocupado por el error en los cómputos matemáticos.

69. El Sr. [Maynulet] señaló que en julio de 2025 sostuvo negociaciones con la parte demandante. El 21 de julio de 2025 las partes tuvieron una reunión por videoconferencia donde realizó una presentación sobre las diferencias de la metodología que WSTE estaba utilizando, para poder explicarle en donde estaba el error matemático. Además, ese mismo día envió una nueva oferta a la parte demandante por un pago de $75,000.00, la suma de $12,233.00 por pagos vencidos y la suma de $3,608.00 mensuales como canon de arrendamiento mensual comenzando el 1 de agosto de 2025 hasta el 31 de julio de 2030.

70. El 4 de agosto de 2025, la representación legal de la parte demandante envió por correo electrónico, una comunicación al Sr. Maynulet mediante la cual informó que la parte demandante rechazaba la oferta de transacción informada por la parte demandada el 21 de julio de 2025, y que las negociaciones llegaron a un impase. De conformidad con la Cláusula Séptima y Vigésima Sexta de la Escritura de Arrendamiento se hizo una notificación de la terminación del contrato de arrendamiento por incumplimiento, al no haber notificado por escrito la cesión y por la falta de pago del incremento de la renta, según la Cláusula Sexta de la Escritura de Arrendamiento. Se exigió el desalojo inmediato.

71. El Sr. Maynulet declaró que las discrepancias con la parte demandante consisten en que se utiliza una metodología de incremento del Índice de Precios al Consumidor acumulativo y le aplican esa suma para incrementar el próximo término para cada extensión. La parte demandada entiende que la metodología correcta según la Cláusula Sexta de la Escritura de Arrendamiento es a base de cada aniversario del contrato de arrendamiento, esto es en el mes de noviembre, en el año que solicita extender para los próximos cinco (5) años. Con ello se calcula el próximo monto a pagar. Por lo que, la parte demandada aplica un incremento a base del Índice de Precios del Consumidor de noviembre en el momento del aniversario, en el momento en donde se pide extender por los próximos cinco (5) años.

72. La parte demandada declaró que no le debe suma de dinero alguna a la parte demandante ante lo pagado y consignado ante el Tribunal.

73. El Sr. Maynulet declaró que según la Cláusula Séptima de la Escritura de Arrendamiento el arrendador tiene derecho a dar por terminado el contrato de arrendamiento por falta de pago o por violación al contrato. El contrato no indica que el incumplimiento está basado en la falta de pago del canon de arrendamiento inicial. El dinero depositado en el Tribunal incluye el pago de renta del mes de agosto y el pago del incremento de la renta por los pasados cinco (5) años, a partir de agosto de 2025 hacia atrás, por haber levantado la prescripción. A pesar de que la carta de reclamación del Lcdo. Nigaglioni fue enviada el 12 de marzo de 2025, la parte demandada consignó el pago desde agosto de 2025, y no desde

marzo de 2025. El testigo no pudo contestar la razón para dicha acción.

74. El Sr. Maynulet nunca advirtió a la parte demandante que las comunicaciones debían realizarse a la dirección postal indicada en la Cláusula Vigesimoprimera de la Escritura de Arrendamiento. Todas las comunicaciones con la parte demandante eran relacionadas a la discrepancia sobre el pago del incremento de la renta, entre otros temas.

75. El Sr. Maynulet reconoció que desde la comunicación del Lcdo. Nigaglioni el 12 de marzo de 2025 hasta que se dio por terminado el contrato de arrendamiento el 4 de agosto de 2025, transcurrieron más de cien (100) días. El Sr. Maynulet declaró que las comunicaciones enviadas por parte del Lcdo. Nigaglioni y el Lcdo. Vázquez en representación de la parte demandante entre los meses de marzo y agosto de 2025, fueron recibidas por el Sr. Peter Lynch y él mediante [...] correo electrónico.

76. El Sr. Maynulet declaró que en las cartas enviadas por el Lcdo. Nigaglioni y el Lcdo. Vázquez, en representación de la parte demandante se reclamaban cantidades diferentes. Entre las partes existe la discrepancia entre la aplicación de las fórmulas para efectuar los cálculos para determinar el incremento de renta a base del Índice de Precios del Consumidor publicado por el Departamento del Trabajo y Recursos Humanos. El Sr. Maynulet reiteró que le comunicó a la parte demandante en varias ocasiones sobre los puntos específicos que encontró que estaban erróneos. Uno de ellos fue el Índice de Precios del Consumidor que estaban utilizando y el otro era el concepto de acumulación, "cumulative".

El foro *a quo* concluyó que el contrato de arrendamiento se extendió en los años 2008, 2013, 2018 y 2023, por lo que el apelado efectuó cuatro (4) extensiones, conforme a la cláusula sexta de la escritura de arrendamiento. De esta manera, indicó que no existía controversia en cuanto a la procedencia de ajustar el canon de arrendamiento mensual en cada extensión, según lo dispuesto en dicha cláusula. Sin embargo, señaló que Leon Sites no presentó evidencia de que notificó al apelado sobre el canon mensual ajustado, con arreglo al incremento determinado por el Índice de Precios al Consumidor para cada período de extensión.

El TPI destacó que la prueba admitida que consideró creíble reflejó la ausencia de una notificación escrita por parte del apelante que fuese remitida por correo certificado, como requería la cláusula vigesimoprimera de la escritura de arrendamiento, máxime cuando el señor León Rodríguez, quien fue testigo del caso, reconoció que las comunicaciones se realizaron únicamente de manera verbal. Además, el foro inferior entendió que la evidencia demostró la existencia de una controversia entre las partes sobre la fórmula para calcular los ajustes y la cantidad adeudada.

El tribunal de instancia observó que Leon Sites decidió resolver el contrato al concluir que WSTE no había pagado los ajustes del canon mensual. Empero, planteó que WSTE admitió que la cláusula sexta contemplaba ajustes por cada extensión y que estos no se habían pagado. No obstante, esgrimió que el apelante nunca reclamó tales cantidades hasta el 12 de marzo de 2025. Es decir, el arrendador no efectuó notificación escrita alguna informando el aumento correspondiente a las extensiones del contrato en los años 2008, 2013, 2018 y 2023. A esto, añadió que WSTE manifestó estar dispuesto a satisfacer el ajuste una vez se determinara la suma adeudada, toda vez que la escritura de arrendamiento no incluía una fórmula para establecer el incremento. El TPI resaltó que la apelante nunca declaró formalmente en incumplimiento a WSTE por falta de pago sino que, al contrario, en el juicio admitió que el apelado pagó mensualmente los $3,365.00 del canon de arrendamiento.

El tribunal inferior subrayó que la cláusula vigesimoprimera de la escritura de arrendamiento obligaba a las partes a realizar cualquier aviso o reclamación mediante correo registrado o certificado dirigido a las direcciones postales provistas en el instrumento público. Ante ello, el TPI indicó que la primera reclamación enviada el 12 de marzo de 2025 a Peter Lynch fue mediante correo electrónico y no se presentó prueba de que se remitió por correo certificado con acuse de recibo a la dirección postal de la parte arrendataria. También determinó que las comunicaciones intercambiadas entre mayo y julio de 2025 se enviaron al correo electrónico del señor Maynulet, representante de WSTE, y no a la dirección designada contractualmente. Incluso, indicó que la notificación de terminación del contrato se transmitió por la misma vía electrónica y no por correo certificado con acuse de recibo a la dirección designada en la cláusula vigesimoprimera de la escritura de arrendamiento. Por ello, el TPI concluyó que Leon Sites incumplió con el medio y la dirección a la

cual venía obligado a notificar cualquier alegado incumplimiento. Expuso que la comunicación electrónica podía utilizarse para tratar asuntos sobre la redacción de un nuevo contrato, no obstante, una notificación o reclamación sobre los términos de la escritura de del arrendamiento vigente debía realizarse según se pactó en la cláusula vigesimoprimera.

En consecuencia, el foro apelado expresó que no podía concluir que WSTE se encontraba en incumplimiento de la escritura de arrendamiento de forma que justificara su desalojo. Pues, el apelante no notificó por escrito los incrementos correspondientes a los períodos de extensión de 2008, 2013, 2018 y 2023, sino hasta el 4 de agosto de 2025, cuando declaró a WSTE en incumplimiento por falta de pago y comunicó su decisión de resolver el contrato.

El TPI puntualizó que la prueba demostró la existencia de una controversia sobre la fórmula para calcular el ajuste del canon, cantidad que WSTE no había satisfecho al momento de la presentación de la *Demanda*. Finalmente, al amparo de la Regla 201 de Evidencia, 32 LPRA Ap. VI, R. 201, el tribunal a quo tomó conocimiento judicial de que el 25 de agosto de 2025, WSTE presentó en el caso PO2025CE02245 una *Moción Informativa y Consignando Pago*, en la que consignó $16,081.89, correspondientes a $3,365.00 por el canon de agosto de 2025 y $12,716.89 por concepto del incremento calculado por dicha parte. También tomó conocimiento judicial de que el 3 de septiembre de 2025, WSTE informó el depósito de $3,608.00 por el canon correspondiente a septiembre de 2025 y el aumento computado según su criterio.

Inconforme con dicha determinación, el 9 de octubre de 2025, Leon Sites presentó un recurso de apelación ante este Tribunal, en el que aludió que el TPI incidió al cometer los siguientes errores:

PRIMER ERROR: ERRÓ EL TPI AL DESESTIMAR LA DEMANDA AL INTERPRETAR QUE, CONFORME A LA CLÁUSULA VIGESIMOPRIMERA DE LA ESCRITURA DE ARRENDAMIENTO, LAS COMUNICACIONES QUE SOSTUVIERON LAS PARTES

DURANTE 144 DÍAS —DIRIGIDAS A SUBSANAR EL INCUMPLIMIENTO DE LA ARRENDATARIA-APELADA — CARECIERON DE EFECTO LEGAL POR NO HABER SIDO NOTIFICADAS POR LA ARRENDADORA-APELANTE A LA DIRECCIÓN DEL APARTADO POSTAL INDICADA EN DICHA CLÁUSULA.

SEGUNDO ERROR: ERRÓ EL TPI AL DETERMINAR QUE "[L]A PARTE DEMANDANTE NUNCA HA NOTIFICADO POR ESCRITO AL ARRENDATARIO EL INCREMENTO EN LA RENTA PARA CADA [PERÍODO] DE LA EXTENSIÓN, ES DECIR EN EL 2008, EN EL 2013, EN EL 2018 Y EN EL 2023." Y AL DETERMINAR QUE "[N]O FUE HASTA EL 4 DE AGOSTO DE 2025 QUE LA PARTE DEMANDADA FUE DECLARADA EN INCUMPLIMIENTO POR FALTA DE PAGO POR EL AJUSTE DEL CANON DE ARRENDAMIENTO; Y SE NOTIFICÓ LA DECISIÓN DE DAR POR TERMINADO EL CONTRATO DE ARRENDAMIENTO." ESTAS DETERMINACIONES SON CONTRARIAS A LA DETERMINACIÓN #23 EN LA CUAL SE DETERMINA QUE MEDIANTE LA CARTA DE 12 DE MARZO DE 2025 SE LE REQUIRIÓ EL PAGO DE LA SUMA ADEUDADA.

TERCER ERROR: ERRÓ EL TPI AL APARENTEMENTE CONCLUIR QUE EL HECHO EN QUE EXISTIERA ENTRE LAS PARTES UNA CONTROVERSIA SOBRE EL MONTO ADEUDADO POR LA METODOLOGÍA DE CALCULARLO, LE IMPIDE A LA ARRENDADORA-APELANTE DAR POR TERMINADO EL CONTRATO DE INCUMPLIMIENTO, A PESAR DE QUE EN LA DEMANDA NO SE ACUMULA UNA ACCIÓN DE COBRO DE DINERO, Y QUE LA ARRENDATARIA EJERCIÓ TARDÍAMENTE SU DERECHO DE CONSIGNAR LA CUANTÍA QUE CONSIDERABA QUE ADEUDABA, PUES LO HIZO DESPUÉS DE QUE LA ARRENDADORA PRESENTÓ LA DEMANDA DE DESAHUCIO. ORSINI V. SÁNCHEZ PARRA, 67 D.P.R. 207, 210 (1947) (UNA CONSIGNACIÓN REALIZADA DESPUÉS DE PRESENTADA LA DEMANDA DE DESAHUCIO "... ES INEFICAZ Y CONSECUENTEMENTE NO SURTE EL EFECTO DEL PAGO.").

En esencia, la apelante sostuvo que el TPI desestimó erróneamente su causa de acción al interpretar que la cláusula vigesimoprimera de la escritura de arrendamiento exigía que todas las comunicaciones sobre sus términos debían enviarse por correo certificado a las direcciones indicadas, bajo pena de nulidad. Señaló que el foro inferior ignoró los principios de hermenéutica contractual, cuyo criterio principal es la intención de las partes. Ante ello, planteó que la intención de la cláusula vigesimoprimera era evitar controversias sobre la recepción de notificaciones formales de incumplimiento, pero que esta no prohibía ni invalidaba las comunicaciones efectuadas por otros medios.

Indicó que las partes intercambiaron conferencias y correos electrónicos para subsanar el incumplimiento, por lo que estas comunicaciones eran válidas y producían efectos legales. Arguyó que negarles eficacia conduciría a un resultado incorrecto y contrario al

principio de los actos propios, puesto que el apelado no podía contradecir su conducta previa. Manifestó que tenía motivos fundados en confiar de buena fe en la validez de las comunicaciones con WSTE para solucionar la disputa sobre los incrementos en la renta. Añadió que ello contradecía las determinaciones de hechos 23 y 29 que establecían que el 12 de marzo de 2025, requirió el pago adeudado y que, desde entonces, las comunicaciones se encaminaron a atender el incumplimiento con el pago de los incrementos. Señaló, además, que desconocía si el arrendatario aún mantenía el apartado postal consignado en la escritura de arrendamiento.

Respecto a la controversia sobre la metodología para calcular los incrementos en la renta, precisó que, aunque dicha controversia existía, el apelado no pagó los incrementos y ocupaba el inmueble. Expuso que determinar el monto exacto adeudado no era requisito para resolver la acción de desahucio por incumplimiento, puesto que lo relevante era la falta reiterada de pago de los incrementos de la renta. Por otro lado, alegó que la consignación realizada por WSTE fue tardía e ineficaz. En este sentido, apuntó que el tribunal de instancia erró al concluir que el caso *Orsini v. Sánchez Parra*, 67 DPR 207 (1947), no era aplicable a los hechos de este caso, cuando permitía evaluar si la consignación de dinero efectuada por el apelado producía algún efecto sobre la causa de acción de desahucio.

Al día siguiente, este Tribunal emitió una *Resolución* para que Leon Sites informara si se proponía reproducir la prueba oral que se desfiló ante el TPI. El 19 de octubre de 2025, el apelante respondió que ello era innecesario, ya que no cuestionó las determinaciones de hechos del TPI, sino su interpretación del contrato.

Por su parte, el 10 de noviembre de 2025, WSTE presentó su alegato. Expuso que aunque ha pagado puntualmente el canon de arrendamiento, Leon Sites pretendía terminar el contrato utilizando negociaciones para una posible extensión del contrato y una disputa

sobre la metodología para calcular los incrementos que nunca exigió conforme disponía el contrato. Afirmó que la *Sentencia* apelada debía confirmarse porque el apelante incumplió el requisito contractual de notificar el incumplimiento, lo que impidió activar los plazos para dialogar y subsanar algún incumplimiento. Especificó que Leon Sites utilizó indebidamente el remedio extraordinario de desahucio para atender disputas contractuales y existe un pleito ordinario paralelo sobre el cálculo del incremento exigido. Argumentó que el desahucio no constituye una forma de extinguir el contrato, sino un mecanismo para recuperar la posesión del inmueble cuando concurren causales extintivas que no se acreditaron en este caso.

Reiteró que la cláusula vigesimoprimera exigía notificaciones formales por correo registrado o certificado a la dirección prevista para que se considerara un aviso o requerimiento. Resaltó que la prueba vertida ante el TPI reflejó que la primera notificación escrita de incumplimiento, realizada el 12 de marzo de 2025, fue enviada a una dirección distinta a la estipulada, por lo que no produjo efectos y no comenzaron a decursar los términos para subsanar el incumplimiento alegado. Al respecto, mencionó que, dado que el aviso de incumplimiento fue ineficaz, Leon Sites nunca reclamó válidamente el incremento pactado para cada período de extensión. Alternativamente, subrayó que la falta de reproducción de la prueba oral impidió que este foro apelativo evaluara el segundo planteamiento de error y obligaba a confirmar la apreciación de la prueba del tribunal inferior. Respecto al alegato de desconocer si el arrendatario mantenía el apartado postal, WSTE esgrimió que no fue planteado ante el TPI, por lo que este Tribunal no debía considerarlo.

En cuanto a la consignación del monto del incremento, señaló que no existía controversia sobre el pago oportuno del canon de arrendamiento establecido en la cláusula quinta de la escritura de arrendamiento. Por ello, sostuvo que este caso era distinguible de

*Orsini v. Sánchez Parra, supra,* puesto que este trataba de un desahucio por falta del pago del canon mensual mientras que la controversia aquí era el incremento cuya notificación contravino la manera pactada en la escritura de arrendamiento.

## II.

### A. Apreciación de la prueba

Al actuar como foro revisor, nos corresponde examinar si el tribunal de instancia aplicó correctamente el derecho a los hechos del caso. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Para cumplir con dicha función, es indispensable que el foro primario desarrolle un expediente completo con determinaciones de hechos sustentadas en la prueba desfilada. *Íd.* Pues, a diferencia del tribunal inferior, los foros apelativos no celebramos juicios plenarios, no observamos el testimonio oral, no dirimimos la credibilidad, ni evaluamos la credibilidad. *Íd.*

No obstante, ante prueba documental, pericial o testimonial ofrecida mediante declaración escrita, este tribunal apelativo se encuentra en igual posición que el de instancia. *Ortiz et al. v. SLG Meaux*, 156 DPR 488, 495 (2002). De igual modo, las conclusiones de derecho son revisables en su totalidad por este tribunal. *Dávila Nieves v. Meléndez Marín, supra*, pág. 770. Ahora bien, como norma general, los tribunales apelativos consideramos correctas las determinaciones de hechos y la apreciación de la credibilidad de los testigos realizadas por el foro primario. *Íd.*, pág. 771. Por esta razón, la intervención de este tribunal apelativo en la revisión de la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos procede ante error manifiesto, pasión, prejuicio o parcialidad. *WMM, PFM et al. v. Colegio et al.*, 211 DPR 871 (2023); *Pueblo v. Hernández Doble*, 210 DPR 850, 866 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021).

**B. Interpretación de los contratos**

Un contrato es un negocio jurídico bilateral que existe cuando concurren los elementos de consentimiento, objeto y causa. Art. 1213 del Código Civil de 1930, 31 LPRA 3391 (derogado, pero aplicable a los hechos del caso). El mismo se perfecciona por el mero consentimiento, manifestado mediante la oferta y su aceptación, momento a partir del cual las partes quedan obligadas a los términos pactados y a todas las consecuencias que, según la buena fe, el uso y la ley, se deriven de su naturaleza. Arts. 1210 y 1214 del Código Civil, *supra*, secs. 3375 y 3401.

Una vez constituido, el contrato obliga a las partes a cumplir con lo pactado, puesto que es obligatorio, siempre que reúna las condiciones para su validez. Art. 1230 del Código Civil, *supra*, sec. 3451; *UIA v. Santander Securities y otros*, 214 DPR 601 (2024); *Rosario Rosado v. Pagán Santiago*, 196 DPR 180 (2016); *PRFS v. Promoexport*, 187 DPR 42, 52 (2012); *BBPR v. Sunc. Talavera*, 174 DPR 686 (2008). Además, la validez y el cumplimiento del contrato no puede dejarse al arbitrio de uno de los contratantes. Art. 1208 del Código Civil, *supra*, sec. 3373. En consecuencia, la contravención de una obligación contractual conlleva, entre otros, el cumplimiento específico de lo acordado. *PRFS v. Promoexport, supra.*

En torno a la interpretación contractual, si los términos son claros y no dejan duda sobre la intención de los contratantes, debe prevalecer el sentido literal de las cláusulas. Art. 1233 del Código Civil, *supra*, sec. 3471. No obstante, si las palabras se contradicen con la intención evidente de las partes, esta última prevalecerá. *Íd.*

Sin embargo, si el contrato requiere interpretación y el sentido literal no es suficiente, debe atenderse la intención de las partes al contratar. *Íd.*; *Asoc. Res. Los Versalles v. Los Versailles*, 194 DPR 258, 267 (2015); *Suárez Figueroa v. Sabanera Real, Inc.*, 173 DPR 694, 711 (2008); *Municipio Mayagüez v. Lebrón*, 167 DPR 713 (2006). Al

respecto, el Tribunal Supremo, citando al tratadista Luis Díaz Picazo, indicó que:

> [Los contratos] deben interpretarse de acuerdo con la buena fe ... [que es] un [estándar] de conducta arreglada a los imperativos éticos exigibles de acuerdo con la conciencia social imperante ... Los contratos han de ser interpretados presuponiendo una lealtad y una corrección en su misma elaboración, es decir, entendiendo que las partes al redactarlas quisieron expresarse según el modo normal propio de gentes honestas y no buscando circunloquios, confusiones deliberadas u oscuridades ... El contrato debe ser interpretado de manera que el sentido que se le atribuya sea el más conforme para llegar a un desenvolvimiento leal de las relaciones contractuales y para llegar a las consecuencias contractuales exigidas conforme a las normas éticas. La buena fe impone también la aplicación de las ideas de confianza y autorresponsabilidad en la interpretación ... Las declaraciones de voluntad deben interpretarse en el sentido más conforme con la confianza que hayan podido suscitar de acuerdo con la buena fe. *Negrón Rivera y Bonilla Ex parte*, 120 DPR 61 (1987).

Igualmente, el juzgador deberá considerar los actos anteriores, coetáneos y posteriores, así como todas las circunstancias concurrentes al momento de la contratación y armonizar los términos contractuales con la verdadera intención de las partes. *Íd.*; Véase Artículo 1234 del Código Civil, *supra*, sec. 3472.

### C. Desahucio

El desahucio es el mecanismo mediante el cual el dueño de un inmueble puede recobrar judicialmente la posesión de este cuando concurre alguna de las causas de extinción del arrendamiento. *Adm. Vivienda Pública v. Vega Martínez*, 200 DPR 235 (2018). Esta acción puede instarse por la vía sumaria u ordinaria. *Íd.*

El desahucio sumario, regulado en el Código de Enjuiciamiento Civil de Puerto Rico, según enmendado, 32 LPRA secs. 2821-2838, responde al interés del Estado de atender con rapidez la reclamación de un propietario cuyo derecho a poseer y disfrutar su inmueble ha sido interrumpido. *Markovic v. Meldon y Fitzgerald*, 2025 TSPR 99, 216 DPR __ (2025); *ATPR v. SLG Volmar-Mathieu*, 196 DPR 5 (2016). Su objetivo es recuperar la posesión de hecho del inmueble mediante el lanzamiento o la expulsión del arrendatario o precarista que lo ocupa sin pagar canon o merced alguna. *Íd.*; *Cooperativa v. Colón Lebrón*, 203 DPR 812 (2020); *CRUV v. Román*, 100 DPR 318 (1971); *Fernández & Hno. v. Pérez*, 79 DPR 244 (1956). Por su naturaleza, el

procedimiento sumario se limita estrictamente a la controversia sobre la posesión. *Markovic v. Meldon y Fitzgerald, supra*. Pues, este procedimiento civil, por su naturaleza sumaria, persigue reivindicar determinados derechos de la manera más rápida y económica posible, reduciendo al mínimo constitucionalmente permitido las garantías procesales. *Turabo Ltd. Partnership v. Velardo Ortiz*, 130 DPR 226 (1992). Por ello, su aplicación se limita a las situaciones específicamente reconocidas por la Asamblea Legislativa. *Íd.*

En el desahucio en precario, la parte demandante debe probar *prima facie*: (1) su título sobre la finca; (2) que la parte demandada la ocupa, y (3) que dicha ocupación es en precario, es decir, sin título ni derecho para retenerla. *CRUV v. Román, supra*; *Meléndez v. Pacheco*, 75 DPR 95 (1953). Si el demandado presenta prueba suficiente de que posee algún derecho a ocupar el inmueble o un título tan bueno o mejor que el del demandante, surge un conflicto de título que hace improcedente el desahucio. *Íd.*

En torno al contrato de arrendamiento, la principal obligación del arrendatario es pagar la renta en la forma, el modo y las condiciones pactadas. *Mora Development Corp. v. Sandín*, 118 DPR 733 (1987). Cuando el arrendatario incumple con el pago, el arrendador puede solicitar la rescisión y tiene derecho al desahucio por falta de pago.[5] *Íd.* De igual manera, si el arrendador incumple sus obligaciones, el arrendatario puede optar por resolver el contrato, reclamar daños o mantenerlo en vigor. *Íd.* Puesto que el arrendamiento genera obligaciones bilaterales, ninguna parte puede

---

[5] El Artículo 1459 del Código Civil, *supra*, sec. 4066, dispone las causas para el desahucio del arrendatario, siendo estas:

    (1) Expiración del término - Haber expirado el término convencional o el que se fija para la duración de los arrendamientos en los Artículos 1467 y 1471.

    (2) Falta de pago - Falta de pago en el precio convenido.

    (3) Infracción de las condiciones del contrato - Infracción de cualquiera de las condiciones estipuladas en el contrato.

    (4) Uso impropio de la cosa arrendada - Destinar la cosa arrendada a usos o servicios no pactados que la hagan desmerecer; o no sujetarse en su uso a lo que se ordena en el inciso (2) del Artículo 1445.

exigir el cumplimiento de la obligación ajena sin haber cumplido u ofrecido cumplir la propia. *Íd.*

**III.**

En el recurso que nos ocupa, Leon Sites planteó tres (3) señalamientos de error. Primero, sostuvo que el TPI interpretó de forma equivocada la cláusula vigesimoprimera de la escritura de arrendamiento al concluir que las comunicaciones enviadas por correo electrónico no cumplían con el método pactado para notificar incumplimientos contractuales. Segundo, argumentó que el foro primario erró al sostener que nunca notificó los ajustes de renta correspondientes a las extensiones de los años 2008, 2013, 2018 y 2023. Tercero, arguyó que la existencia de una controversia sobre la fórmula para calcular el ajuste de renta no impedía dar por terminado el contrato y que la consignación realizada por WSTE debía considerarse tardía e ineficaz.

No obstante, tras un análisis exhaustivo del expediente, así como de las determinaciones de hechos formuladas por el TPI, no hallamos que estos planteamientos de error desvirtúen la corrección jurídica de la *Sentencia* apelada.

Como cuestión de umbral, es indispensable reiterar que cuando los términos de un contrato son claros y no dejan duda sobre la intención de las partes, prevalece su sentido literal. En este caso, la escritura de arrendamiento contenía términos precisos, particularmente en dos (2) cláusulas esenciales para resolver la controversia ante nos: la cláusula sexta, que reguló las extensiones del contrato y el ajuste del canon de arrendamiento; y la cláusula vigesimoprimera, que fijó la forma en que las partes debían notificarse cualquier requerimiento o reclamación.

La cláusula sexta disponía que el arrendatario —WSTE— podía extender el contrato por cinco (5) términos sucesivos de cinco (5) años cada uno, manteniéndose todas sus condiciones salvo el canon de la

renta, el cual debía actualizarse conforme al aumento porcentual del Índice de Precios al Consumidor publicado por el Departamento del Trabajo de Puerto Rico. El propio texto contractual demostró que dicho ajuste no operaba de manera automática. La aplicación del aumento requerido dependía de la obtención de un dato externo que no era controlable por las partes —el índice vigente o, en su defecto, el último disponible— y de la realización de un cálculo que no surgió directamente del contrato, sin intervención de las partes. Es decir, era indispensable que el arrendador comunicara al arrendatario cuál era el nuevo canon aplicable a cada extensión. Solo así el arrendatario podía conocer la nueva cuantía que estaba obligado a pagar, de considerar extender el contrato, y cumplir con su obligación.

Esa obligación de notificación se armonizaba plenamente con la cláusula vigesimoprimera, la cual requería que toda notificación formal se remitiera mediante correo registrado o certificado a las direcciones expresamente consignadas en la escritura de arrendamiento. Las partes, por tanto, escogieron un mecanismo formal para comunicaciones de consecuencias jurídicas relevantes.

Precisamente por ello, el foro inferior concluyó que las comunicaciones electrónicas intercambiadas entre marzo y agosto de 2025, si bien demostraron diálogo entre las partes, no constituyeron notificaciones válidas para imputar a WSTE un incumplimiento contractual, conforme a la escritura de arrendamiento. No es óbice de esta conclusión el hecho de que el apelado haya respondido a tales comunicaciones. Pues, esa interacción no significó que las partes acordaron un método alterno para activar la facultad resolutoria.

Respecto al segundo planteamiento, tampoco advertimos contradicción entre la determinación de hechos 23 y la conclusión de que no se habían notificado los ajustes correspondientes a las extensiones anteriores. El tribunal *a quo* reconoció que, en efecto, el 12 de marzo de 2025 Leon Sites remitió una comunicación

reclamando sumas que entendía adeudadas por concepto de ajuste. Sin embargo, con acierto distinguió que dicha misiva no se envió por correo certificado ni a la dirección pactada. Además, la misma se envió diecisiete (17) años después de la primera extensión del contrato. Dicha comunicación no sustituía la obligación del arrendador de notificar los ajustes en los años 2008, 2013, 2018 y 2023, ni podía generar incumplimiento imputable al arrendatario. No se le puede imputar incumplimiento a WSTE cuando Leon Sites nunca notificó el canon ajustado al inicio de cada extensión del contrato hasta el 2025, años después de que esas extensiones estuvieran en vigor. Además, según estableció el TPI, el apelado no se ha negado a satisfacer el ajuste correspondiente una vez se determine la metodología aplicable y el monto preciso. No obstante, ese proceso —que implica la interpretación técnica de la cláusula sexta y el cálculo adecuado del Índice de Precios al Consumidor— constituye materia propia del pleito ordinario paralelo, no del estrecho marco del desahucio que nos ocupa. De ahí que la disputa sobre el ajuste no pueda servir como fundamento para declarar un incumplimiento que active el remedio extraordinario del desahucio en precario.

El tercer planteamiento también carece de fundamento. El desahucio en precario es un mecanismo extraordinario diseñado estrictamente para permitir al dueño recobrar la posesión del inmueble cuando concurren causales como la falta de pago de la renta pactada. Su función no es adjudicar disputas sobre la interpretación de un contrato ni de fijar cánones inciertos, por el contrario, su naturaleza sumaria exige una demostración clara de que el ocupante carece de derecho a permanecer en el predio. En este caso, no se acreditó la existencia de causal extintiva alguna.

La cláusula quinta de la escritura de arrendamiento establece palmariamente que el arrendatario estaría obligado a pagar una renta anual de $40,380.00, pagadera en doce (12) plazos mensuales de

$3,365.00. Esa cláusula, por su tenor literal, regula exclusivamente el canon base que debía satisfacer el arrendatario durante la vigencia del contrato, sin incluir referencia alguna a ajustes en la renta. La prueba admitida reveló, sin contradicción, que WSTE ha cumplido fielmente con esta obligación desde 2004, pagando puntualmente el canon mensual de $3,365.00 fijado en la cláusula quinta. Del expediente no surgió evidencia de incumplimiento en ese pago ni de rechazo por parte de Leon Sites de la suma enviada por el arrendatario desde el 2008 en adelante.

La controversia entre las partes es el ajuste del canon de renta, sujeta al cálculo del Índice de Precios al Consumidor y cuya metodología del cálculo aún no ha sido acordada entre las partes. Reiteramos que ese desacuerdo metodológico, que ya se ventila en un pleito ordinario paralelo, no equivale jurídicamente a una falta de pago del canon exigible bajo la escritura de arrendamiento. Más aún, la determinación del monto específico que, en su día, pudiera representar un aumento en la renta es una controversia propia del proceso ordinario y no forma parte del marco que este foro debe resolver en el presente recurso apelativo. Nuestra función se limita a examinar si, de acuerdo al contrato y a la prueba presentada, existe un incumplimiento en el pago del canon pactado que active el remedio del desahucio. La evidencia demostró que no lo hubo.

El desacuerdo sobre los ajustes, el cual como ya expresamos está pendiente de dilucidación, no puede equipararse a una falta de pago del canon estipulado, y por tanto no activó ninguna causal para decretar el desahucio en precario. WSTE continúa ostentando un título para el arrendamiento por virtud de extensiones no impugnadas, ha cumplido con el pago del canon base estipulado y no ha sido notificado de incumplimiento conforme al mecanismo pactado. En ausencia de una falta de pago, el recurso del desahucio resulta improcedente.

Cabe subrayar que los argumentos del apelante no nos conducen a concluir que el TPI incurrió en error alguno en su apreciación de la prueba o en la adjudicación de credibilidad. Ello cobra aún mayor fuerza al considerar que el apelante no elevó la prueba oral desfilada en instancia, lo cual limita su capacidad para cuestionar las determinaciones de credibilidad hechas por el juzgador que tuvo contacto directo con los testigos.

Es meritorio aclarar que nada de lo aquí dispuesto se debe interpretar como que este Tribunal ha adjudicado sobre la existencia, inexistencia o cuantía de una posible deuda por ajustes al canon de renta. Esa determinación corresponde al pleito ordinario paralelo y no afecta la conclusión que hoy nos ocupa: que, para fines de esta acción de desahucio en precario, no se demostró incumplimiento contractual que justificara la procedencia del mismo.

A la luz de todo lo anterior, resulta evidente que WSTE no ocupa el inmueble en precario. El mecanismo extraordinario del desahucio no es el cauce adecuado para resolver una controversia sobre ajustes de renta cuya cuantía y metodología aún están en disputa. Por ello, procede confirmar la *Sentencia* apelada.

**IV.**

Por los fundamentos que anteceden, se confirma la determinación apelada.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones